**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

ANN MARIE PARSELL,

Plaintiff,

vs.

EQUIFAX INFORMATION SERVICES, LLC; EXPERIAN INFORMATION SOLUTIONS, INC.; TRANS UNION, LLC; FIRST TECH FEDERAL CREDIT UNION; and FINANCIAL ASSISTANCE, INC.,

Defendants.

Civil Action No.: 5:22-cv-01002-XR

**PLAINTIFF ANN MARIE PARSELL'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Plaintiff Ann Marie Parsell ("Plaintiff"), by and through her undersigned counsel, and pursuant to Fed. R. Civ. P. 56, hereby moves this Court for Partial Summary Judgment against the only remaining Defendant in this matter, First Technology Federal Credit Union ("First Tech"). Plaintiff asks that the Court award Plaintiff summary judgment on Plaintiff's claims that First Tech negligently and willfully violated the Fair Credit Reporting Act, with the amount of Plaintiff's damages to be determined by a jury.

# TABLE OF CONTENTS


**I. INTRODUCTION** .......... 1

**II. STATEMENT OF FACTS** .......... 2

**A. Plaintiff's Identity Was Stolen by Her Sister.** .......... 2

**C. Plaintiff Disputed the Inaccurate Reporting with the CRAs and First Tech** .......... 4

**D. Plaintiff Sustained Damages as a Result of First Tech's Failures to Reinvestigate her Identity Theft Disputes** .......... 5

**III. LEGAL STANDARD** .......... 5

**IV. ARGUMENT** .......... 6

**A. First Tech's Admissions and the Undisputed Facts Clearly Demonstrate First Tech's Reinvestigations – Or Lack Thereof – Were Unreasonable.** .......... 6

**B. First Tech's Admissions and Undisputed Facts Demonstrate First Tech Acted in Reckless Disregard of the Requirements of § 1681s-2(b) When Its Procedures Precluded an Investigation That Complied with the Requirements of 1681s-2(b) and When It Failed to Even Follow Those Policies.** .......... 18

**V. CONCLUSION** .......... 20

# TABLE OF AUTHORITIES

**Cases**

*Akalwadi v. Risk Management Alternatives, Inc.*, 336 F. Supp. 2d 492, 511 (D. Md. 2004)........ 19
*Boggio v. USAA Fed. Sav. Bank*, 696 F.3d 611, 616, 620 (6th Cir. 2012) .................................. 17
*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)........................................................................ 5
*Commerce & Indus. Ins. Co. v. Grinell Corp.,* 280 F.3d 566, 570 (5th Cir. 2002)........................ 5
*Dennis v. BEH-1, Ltd. Liab. Co.*, 520 F.3d 1066, 1071 (9th Cir. 2008)....................................... 17
*Donnelly v. JPMorgan Chase, NA*, No. H-13-1376, 2014 U.S. Dist. LEXIS 13446, 2014 WL 429246, at *5 (S.D. Tex. Feb. 4, 2014)........................................................................ 7
*Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1163 (9th Cir. 2009)................................ 7
*Haberman v. PNC Mortg. Co.,* No. 4:11cv126, 2012 U.S. Dist. LEXIS 191086, *24-25 (E.D. Tex. Sep. 7, 2012) ........................................................................................................ 19
*James v. MRC Receivables Corp.*, No. 16-0448, 2018 U.S. Dist. LEXIS 109493, at *17 (W.D. La. June 28, 2018)....................................................................................................... 19
*Johnson v. MBNA Am. Bank, NA*, 357 F.3d 426, 430-31 (4th Cir. 2004) .................................... 17
*Pinner v. Schmidt*, 805 F.2d 1258, 1262 (5th Cir. 1986)................................................................ 17
*Price v. Sallie Mae, Inc.*, No. 1:08-CV-2712-CAP-ECS, 2010 U.S. Dist. LEXIS 155881, at *14-15 (N.D. Ga. Aug. 23, 2010)........................................................................................ 18
*Safeco Ins. Co of America v. Burr*, 551 U.S. 47, 59-60, 70 (2007).............................................. 18
*Saunders v. Branch Banking & Trust Co. of Va.*, 526 F.3d 142, 150 (4th Cir.2008) ...................... 8
*Schoch v. Wells Fargo Home Mortg.*, No. 4:16-CV-619-ALM-CAN, 2017 U.S. Dist. LEXIS 81233, at *9 (E.D. Tex. Apr. 11, 2017) ......................................................................... 7
*Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-248 (1986)) ................................................................................................ 6
*Sepulvedo v. CSC Credit Services, Inc.*, 158 F.3d 890, 895 (5th Cir. 1998) .................................. 7
*Shaunfield v. Experian Info. Sols., Inc.*, 991 F.Supp.2d 786, 794 (N.D. Tex. 2014)....................... 6
*Smith v. National City Mortg.*, No. A-09-CV-881 LY, 2010 WL 3338537, at *14 (W.D. Tex. Aug. 23, 2010) ........................................................................................................ 6

**Statutes**

12 C.F.R. § 1022.42(a)..................................................................................................... 18
15 U.S.C. § 1681n(a)(2)................................................................................................... 18
15 U.S.C. § 1681s-2(b) ..................................................................................................... 20
15 U.S.C. § 1681s-2(b)(1)(A)............................................................................................ 6
15 U.S.C. § 1681s-2(b)(1)(B) ............................................................................................ 6
15 U.S.C. § 1681s-2(b)(1)(C) ............................................................................................ 6
15 U.S.C. § 1681s-2(b)(1)(D)............................................................................................ 6
15 U.S.C. § 1681s-2(b)(1)(E) ............................................................................................ 6
1681i(a)(2) ........................................................................................................................ 6

**Rules**

Fed. R. Civ. P. 56............................................................................................................. i
Fed. R. Civ. P. 56(c) ......................................................................................................... 5

## I. INTRODUCTION

Before the Court is a dispute concerning inaccurate information reported in Plaintiff's credit reports. The inaccurate information at issue relates to an auto loan obtained in Plaintiff's name which was the product of identity theft. Plaintiff's sister used Plaintiff's personal information to obtain a loan from First Tech to finance the purchase of a new car. Following a car accident in which the vehicle was totaled, Plaintiff's sister ceased making loan payments and First Tech referred the loan account to a collection agency while also reporting to the national consumer reporting agencies ("CRAs") that Plaintiff defaulted on the loan. Plaintiff learned of the identity theft after the default began being reported in her credit reports and disputed First Tech's reporting to the CRAs. Over a period of eight months, Plaintiff disputed First Tech's reporting on numerous occasions and supported those disputes with evidence, including police reports and an Identity Theft Report from the Federal Trade Commission ("FTC"). Despite Plaintiff's numerous disputes, First Tech steadfastly refused to correct its inaccurate reporting.

Plaintiff filed suit, alleging that First Tech violated the Fair Credit Reporting Act, 15 U.S.C. 1681, *et seq*. ("FCRA"), by repeatedly failing to reasonably reinvestigate Plaintiff's disputes. First Tech rejected all of Plaintiff's disputes, "verifying" its reporting to the CRAs each time without properly conducting any reinvestigation. In fact, First Tech's own testimony contains an admission that First Tech violated the FCRA. First Tech's disregard of Plaintiff's disputes had a devasting effect on Plaintiff's credit rating and personal life, causing her severe emotional distress. Because First Tech's violations were conscious and repeated, those actions constitute a reckless disregard of First Tech's duties under the FCRA, which entitles Plaintiff to statutory and punitive damages. Accordingly, Plaintiff asks this Court to grant partial summary judgment in her favor of her claims against First Tech.

## II. STATEMENT OF FACTS

### A. Plaintiff's Identity Was Stolen by Her Sister.

Plaintiff is a single mother who cares for her teenage daughter and elderly parents in New Braunfels, Texas. Complaint, ¶ 12; Ex. 1, Deposition of Ann Marie Parsell ("Parsell Depo."), at 8:22-11:8. In October 2017, Plaintiff's sister, Carol Redus ("Redus") purchased a 2017 Mitsubishi Lancer from Mission Mitsubishi ("Mission") in San Antonio, Texas, using Plaintiff's identifying information. Complaint, ¶ 16; *see also*, Ex. 2, Loan Documents. To finance the vehicle, Redus applied for an auto loan from First Tech ("the Loan"). Ex. 2. The credit application and supporting documents (the "Loan Documents") were completed and collected by Mission and submitted to First Tech, which approved the Loan and saved the Loan Documents in its records. *Id*.

In support of her purchase agreement and credit application, Redus provided a temporary driver's permit which included Plaintiff's name, a photograph of Redus, and a fictitious address on Wurzbach Road. *Id.*, at 5; Parsell Depo., at 71:14-72:4; *see also* Ex. 3, ID Photos. Redus mistakenly signed the fraudulent permit using her own name, "Carol L. Redus." Ex. 2, at 5. Redus made a similar mistake elsewhere in the Loan Documents; at one point, to authenticate a corrected mistake, Redus wrote her own initials, "CR." *Id.*, at 4. Redus' credit application includes Plaintiff's name and Social Security Number, but lists an address of "10004 Wurzbach Rd, San Antonio, TX 78130." While there is a building at 10004 Wurzbach Road in San Antonio, Texas, that building is a UPS Store. *Id.*, at 2, 4. Furthermore, the correct zip code for the 10004 Wurzbach Road address is 78230. Needless to say, neither Plaintiff nor anyone else has ever lived at the address 10004 Wurzbach Rd, San Antonio, TX 78130. Parsell Depo., at 66:15-25. The Loan Documents also included other information that belonged to Redus rather than Plaintiff, including a phone number, partial email address, and employers. Parsell Depo., at 66:8-12, 77:11-21, 68:22-69:6, 69:9-15.

**B. Plaintiff Discovered Her Identity Had Been Stolen.**

In 2021, Plaintiff received communications from former Defendant Financial Assistance, Inc. ("Financial Assistance"), a debt collection agency. Financial Assistance sought to collect a debt relating to the vehicle Redus had purchased from Mission in Plaintiff's name. Parsell Depo., at 28:25. Initially, Plaintiff believed that the communications were a scam. *Id*., at 30:1-5. However, shortly thereafter, in October 2021, Plaintiff discovered that there were two accounts in her credit reports that she had not opened and that she did not recognize. Parsell Depo., at 29:6-30:5. Her credit reports included an account with First Tech and a collection account with Financial Assistance. Plaintiff never opened either of these accounts and had no knowledge of them until receiving the collection letters in October 2021. Complaint, ¶¶ 19-22; Parsell Depo., at 32:3-32:17.

Plaintiff's investigation into the First Tech and Financial Assistance accounts led her to uncover that the accounts were related to an auto loan that was obtained by Redus in Plaintiff's name. Parsell Depo., at 32:3-33:7. In October 2021, Plaintiff contacted First Tech by telephone and asked for copies of all documents that related to the First Tech account in her name. *See* Exhibit 4, Plaintiff's Telephone Call to First Tech. During the same phone call, Plaintiff communicated that the account was the product of fraud, that her sister was the perpetrator of that fraud, and that Plaintiff was in the process of filing charges relating to that fraud with the police. *Id*., at 6:16-6:20; 7:25-7:30, 8:56-10:00. In fact, First Tech even communicated to Plaintiff during that phone call that First Tech was notating that the account was the product of fraud and furthermore that First Tech was going to contact the police on Plaintiff's behalf to notify law enforcement of the fraud. *Id*., at 10:05-11:05. Thereafter, still in October 2021, Plaintiff filed an FTC Identity Theft Report and a formal police report. *See* Exhibit 5, FTC Report; Exhibit 6, Police Report.

### C. Plaintiff Disputed the Inaccurate Reporting with the CRAs and First Tech

When a consumer contacts a CRA to dispute information about an account, the CRA communicates details about the consumer's dispute to the furnisher of that information through an internet-based system that permits the exchange of data about consumers between furnishers and CRAs known as e-OSCAR. Exhibit 7, Deposition of Aleksandra Ivanovic ("Ivanovic Depo."), at 55:2-56:14. This communication from the CRA to a credit furnisher comes in the form of an "automated consumer dispute verification form" ("ACDV"), which is comprised of coded information contained details about the nature of the consumer's dispute. *Id*. If the consumer provides documents to the CRA in connection with their dispute, images of those documents are included with the ACDV and transmitted to the furnisher. *Id*.

In October 2021, Plaintiff contacted CRAs Experian Information Solutions, Inc. ("Experian") and Equifax Information Services, LLC ("Equifax") to dispute the First Tech account.[1] Experian and Equifax each responded by sending ACDVs to First Tech on October 18, 2021, and October 19, 2021, respectively. Exhibit 8, First Tech ACDV Response to Equifax; Exhibit 9, First Tech ACDV Response to Experian. The ACDVs sent by Equifax and Experian communicated an entry within the "Dispute Code" field of "103: Claims true identity fraud, account fraudulently opened. Provide or confirm complete ID." *Id*. When First Tech received those ACDVs, it understood that this code was a communication that the account had been fraudulently opened. Exhibit 10, Deposition of Ashley Skaale ("Skaale Depo."), at 130:20-131:1. First Tech responded to those ACDVs by continuing to report the First Tech account as associated with Plaintiff. Ex. 8; Ex. 9. Between October 2021 and June 2022, First Tech received an additional four ACDVs related to the account First Tech was reporting in Plaintiff's credit reports, and on

[1] Plaintiff also submitted multiple disputes relating to the account reported by Financial Assistance.

every single occasion First Tech responded by verifying that its reporting was accurate. *See* Exhibit 11, First Tech ACDV Responses.

### D. Plaintiff Sustained Damages as a Result of First Tech's Failures to Reinvestigate her Identity Theft Disputes

Plaintiff has suffered emotional and physical ailments as a result of the identity theft and the erroneous attribution of the defaulted auto loan to her. Plaintiff has long suffered from bi-polar disorder. Parsell Depo., at 54:17-23. As a consequence of the long ordeal of trying – unsuccessfully – to convince First Tech to correct its inaccurate reporting by repeatedly disputing its reporting, Plaintiff has suffered from depression and post-traumatic stress disorder ("PTSD"). *Id.*, at 51:4-12. The emotional distress associated with her depression and PTSD has had physical manifestations, including insomnia, difficulty in breathing, migraines, body aches, weight gain, and high blood pressure, which she has measured with a home monitor. *Id.*, at 52:4-21, 55:14-22, 56:2-57:2, 303:18-25.

## III. LEGAL STANDARD

Fed. R. Civ. P. 56(c) provides that a court may grant a motion for summary judgment when "there is no genuine issue as to any material fact and [. . .] the moving party is entitled to a judgment as a matter of law." The moving party bears the initial burden of showing that no genuine issues of material fact exist in light of the pleadings, evidence produced in discovery, and affidavits submitted by the parties. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Similarly, Rule 56(e) requires the nonmoving party to go beyond the pleadings and show that there is a genuine issue for trial. *See Celotex*, 477 U.S. at 324.

An issue is "material" if its resolution could affect the outcome of the action. *Commerce & Indus. Ins. Co. v. Grinell Corp.,* 280 F.3d 566, 570 (5th Cir. 2002). A dispute of material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving

party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-248 (1986)).

## IV. ARGUMENT

### A. First Tech's Admissions and the Undisputed Facts Clearly Demonstrate First Tech's Reinvestigations – Or Lack Thereof – Were Unreasonable.

i. *Elements of an FCRA Claim*

"Although 'the FCRA primarily regulates consumer credit reporting agencies, the statute also creates various obligations on 'furnishers of information' to provide accurate information to consumer credit reporting agencies.'" *Shaunfield v. Experian Info. Sols., Inc.*, 991 F.Supp.2d 786, 794 (N.D. Tex. 2013) (quoting *Smith v. National City Mortg.*, No. A-09-CV-881 LY, 2010 WL 3338537, at *14 (W.D. Tex. Aug. 23, 2010)). When a CRA notifies a furnisher that a consumer has disputed the accuracy or completeness of the information reported by the furnisher, the furnisher must conduct a reinvestigation that meets **all** of the following five requirements:

1) "conduct an investigation with respect to the disputed information," 15 U.S.C. § 1681s-2(b)(1)(A);
2) "review all relevant information provided by the consumer reporting agency pursuant to section 1681i(a)(2) of this title," 15 U.S.C. § 1681s-2(b)(1)(B);
3) "report the results of the investigation" to the CRA, 15 U.S.C. § 1681s-2(b)(1)(C);
4) if the investigation finds that the disputed information is inaccurate or incomplete, the furnisher must notify all of the other nationwide consumer reporting agencies to which the person furnished the information, 15 U.S.C. § 1681s-2(b)(1)(D);
5) if the investigation finds that that disputed information is "inaccurate or incomplete or cannot be verified," the furnisher must modify, delete, or permanently block its reporting of such information to the CRA, 15 U.S.C. § 1681s-2(b)(1)(E).

When a consumer alleges that a furnisher has violated its duties under § 1681s-2(b), they must prove four elements: "1) the furnisher provided inaccurate credit information about Plaintiff

to a CRA; 2) Plaintiff notified a CRA that this information in [their] credit report was inaccurate; 3) the CRA notified the furnisher of the dispute; and 4) after receiving this notice, the furnisher failed to conduct a reasonable investigation and provide notice to the CRA to correct the reporting errors." *Schoch v. Wells Fargo Home Mortg.*, No. 4:16-CV-619-ALM-CAN, 2017 U.S. Dist. LEXIS 81233, at *9 (E.D. Tex. Apr. 11, 2017), *report and recommendation adopted*, No. 4:16-CV-619, 2017 U.S. Dist. LEXIS 80799, 2017 WL 2312079 (E.D. Tex. May 26, 2017); *see also Donnelly v. JPMorgan Chase, NA*, No. H-13-1376, 2014 U.S. Dist. LEXIS 13446, 2014 WL 429246, at *5 (S.D. Tex. Feb. 4, 2014).

The evidence in this case – including First Tech's documents and the testimony of its own witnesses – leaves no room for any dispute about the second or third elements of Plaintiff's claim under § 1681s-2(b). Plaintiff inarguably submitted disputes to the CRAs about First Tech's reporting and the CRAs notified First Tech of Plaintiff's disputes by sending First Tech ACDVs. First Tech's own records and the admissions of its witnesses establish these elements beyond any doubt. *See generally*, Ex. 12. Consequently, Plaintiff is entitled to summary judgment if the record shows that there are no questions of material fact about whether: 1) First Tech's reporting was accurate and/or complete; and 2) First Tech's investigations were reasonable.

ii. *First Tech's Inaccurate or Incomplete Reporting*

A furnisher breaches its duty to provide accurate information to CRAs when its information is "patently incorrect" or "misleading in such a way and to such extent that it can be expected to adversely affect credit decisions." *Sepulvedo v. CSC Credit Services, Inc.*, 158 F.3d 890, 895 (5th Cir. 1998); *see also Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1163 (9th Cir. 2009) (citing *Sepulvedo, supra*). A furnisher breaches this duty of accurate reporting if it fails to modify or correct information that a consumer has disputed to a CRA and that cannot be verified. *See*

*Gorman*, 584 F.3d at 1164.

For the purposes of § 1681s-2(b), a furnisher also breaches this duty if its reporting fails to note that the consumer has submitted a meritorious dispute about that account. *Gorman*, 584 F.3d at 1163; *Saunders v. Branch Banking & Trust Co. of Va.*, 526 F.3d 142, 150 (4th Cir.2008). For example, in *Saunders*, the Fourth Circuit concluded that, when a consumer does not pay a debt for which she has submitted a meritorious dispute, the lack of payment "does not reflect financial irresponsibility," and any reporting that omits any mention of the consumer's dispute could be misleading about the consumer's willingness to pay her legitimate debts. *Saunders*, 526 F.3d at 150; *see also Gorman*, 584 F.3d at 1163 ("[i]t is the failure to report a bona fide dispute, a dispute that could materially alter how the reported debt is understood, that gives rise to a furnisher's liability under § 1681s-2(b)"). A furnisher must change or modify its reporting if its reinvestigation of the consumer's dispute shows that its previous reporting was "inaccurate or incomplete or cannot be verified." 15 U.S.C. § 1681s-2(b)(1)(E).

The undisputed facts show that First Tech repeatedly breached this duty with respect to each of Plaintiff's disputes. For each of Plaintiff's numerous disputes, First Tech "verified" to the CRAs that Plaintiff was the person who agreed to the Loan, even though First Tech never performed **any** reinvestigation before coming to this erroneous conclusion. After receiving the first two ACDVs relating to Plaintiff's disputes in October 2021, First Tech – pursuant to its own woefully insufficient procedures – refused to conduct any investigation at all into the substance of Plaintiff's disputes, and "verified" its reporting without: 1) confirming that Plaintiff was actually the person who was responsible for the Loan; or 2) noting that Plaintiff disputed that she was the person who agreed to the Loan. In fact, of the **seven** ACDVs that First Tech received relating to the Loan, only once – in response to the sixth ACDV, in June 2022 – did First Tech ever actually

perform any inquiry into the substance of Plaintiff's disputes. *See* Ex. 12, at 1-2. Prior to then, the entirety of First Tech's "reinvestigations" amounted to nothing more than rubberstamping that the information in the file First Tech with Plaintiff's identifying information matched to the information First Tech was furnishing to the credit bureaus. First Tech readily acknowledges that this kind of data conformity "reinvestigation" did not address the question of whether the Loan was the product of identity theft. Skaale Depo., at 130:20-133:1.

When First Tech **finally** performed an actual reinvestigation of Plaintiff's dispute – **after** a First Tech employee had already returned an ACDV response to the requesting CRA – First Tech still failed to include any reference to Plaintiff's dispute when it verified the First Tech tradeline as accurate. *See* Ex. 11, at 7-8. Given these facts, First Tech's reporting was inaccurate in two principal respects: 1) because it failed to report that Plaintiff had submitted an identity theft dispute when First Tech had made no determination as to whether her dispute was or was not meritorious; and 2) because it reported that it had "verified" that Plaintiff was the person who agreed to the Loan, even though up until June 2022, it had never conducted **any** inquiry by which it could make such a claim.

It is important to note that these inaccuracies do not depend upon resolving the question of whether Redus had, in fact, stolen Plaintiff's identity. Simply put, there is nothing within any of First Tech's documents or within the hundreds of pages of testimony from First Tech's witnesses which demonstrates that First Tech **ever** verified that Plaintiff was in any way responsible for the Loan. Period. In reality, First Tech's testimony was that it continued to "verify" as "accurate" its reporting because First Tech never uncovered facts to prove that what it was reporting was **inaccurate**:

> Q: So what First Tech conveys and what Ms. Ivanovic and Ms. Espinoza have testified is that when the ACDV responses were submitted to the bureaus, the response was

we are verifying that the information First Tech is furnishing is correct, meaning First Tech has verified that, in fact, this account does belong to Ms. Parsell. Do you understand that that is the communication?

A: First of all, it's not that we're saying we don't have enough information to investigate. It's that based on the very reduced review we can do, without getting that additional information, we don't have enough information to assert that this is not accurate, and, therefore, based on the information that's been provided to us, it does still appear to be accurate because we don't even have at that point confirmation that it's the true consumer even complaining that it's ID theft.

[…]

Q: So there may be a fundamental misunderstanding here. Do you understand that it is not First Tech's obligation under the Fair Credit Reporting Act to prove that the information is inaccurate but, rather, First Tech must verify the information it does have is accurate? Do you understand the distinction between those two things?

A: Yes. Our scope in the fraud operations department is to review and determine if we suspect ID theft happened. Since they're saying was not accurate, is that they opened the account, and based off information that was provided, we don't have anything more to determine that they did not open the account based on what they had provided, so we were declining the request, as we don't have sufficient information to determine that it was not accurate ownership.

Skaale Depo, at 164:24-167:7. First Tech explicitly testified that because it was unable to prove that Plaintiff **did not** open the Loan, it continued to report the Loan in her credit reports. This is a fundamental flipping of a furnisher's obligations under the FCRA, which very clearly require a furnisher to verify that what it is reporting is accurate and if the information "cannot be verified," the furnisher is obligate to "modify, delete, or permanently block its reporting of such information to the CRA." 15 U.S.C. § 1681s-2(b)(1)(E). First Tech's testimony is an unabashed admission that it failed to verify the information it was reporting about Plaintiff was accurate, but continued to report it in her credit reports because First Tech believed that **Plaintiff** failed to prove that First Tech's reporting was inaccurate. Furthermore, as detailed above, First Tech's reporting was also inaccurate because the omission of any reporting about Plaintiff's disputes amounted to a reporting that Plaintiff's disputes lacked merit when First Tech never actually inquired into the merits of

those disputes. Simply put, First Tech verified its reporting of the First Tech account in response to all three disputes without conducting an investigation into the substance of the disputes as required under the FCRA.

Finally, to the extent that there is any assertion that Redus did not, in fact, steal Plaintiff's identity, any such assertion is patently untrue. To that end, as a result of Plaintiff's criminal complaint filed against Redus, the Bexar County Sheriff's Office issued an indictment and warrant for Redus' arrest relating to four felony counts of knowingly making a materially false or misleading written statement "with intent to obtain credit, namely, a loan to purchase an automobile." Exhibit 13, Indictment of Carol L. Redus.

iii. *First Tech's Unreasonable Investigations*

First Tech's own documents and admissions demonstrate beyond question that it never conducted any reinvestigation that met the requirements of § 1681s-2(b)(1). First Tech's responses to Plaintiff's multiple disputes are riddled with numerous deficiencies that left it far short of those requirements. To the extent that First Tech argues that it inquired into the merits of Plaintiff's allegations of identity theft, that inquiry never reached the standard of reasonableness necessary to comply with the FCRA.

When First Tech receives an ACDV, it first determines whether the dispute is a "standard" dispute or a fraud dispute. Ivanovic Depo., at 56:23-57:5. Standard disputes relate to information like account balance or payment history, while fraud disputes – like Plaintiff's – relate to disputes involving allegations of identity theft. *Id.*, at 58:23-59:12; 56:23-57:5. When a dispute is a fraud dispute, the matter is referred to First Tech's fraud department for review. *Id.*, at 59:13-19.

When reviewing fraud disputes, the fraud department's first step is to "authenticate" the identity of the consumer who submitted the dispute. Ivanovic Depo., at 102:10-19; Exhibit 14,

Deposition of Hanna Hernandez ("Hernandez Depo.") at 49:7-9. The principal means for authenticating a consumer's identity is a notarized affidavit form created and maintained by First Tech. *See* Ivanovic Depo., at 102:10-19; Skaale Depo., at 68:11-69:13. However, neither the existence of this affidavit nor its requirement is posted anywhere publicly that First Tech could identify and are not conveyed to consumers who submit fraud disputes. Ivanovic Depo., at 104:1-7; Skaale Depo., at 229:21-230:4. First Tech does not accept either official Identity Theft Affidavits from the FTC or police reports as substitutions for this affidavit. Hernandez Depo., at 94:16-19; Skaale Depo., at 216:6-12.

When First Tech receives an ACDV that lacks First Tech's preferred forms of identity authentication, First Tech does not conduct **any** investigation into the substance of the dispute. Hernandez Depo., at 49:20-50:3. Moreover, First Tech does not reach out to the consumer to inform them that it needs verification of the consumer's identity. Skaale Depo., at 221:13-223:19. Essentially, unless a consumer fills out First Tech's preferred form – **the existence of which is not public and never communicated to the consumer** – First Tech refuses to reinvestigate a consumer's dispute related to identity theft. First Tech estimates that about **90-95% of all identity theft disputes** it receives lack sufficient documentation to permit an actual reinvestigation. Hernandez Depo., at 36:1-10. Or, stated another way, only 5-10% of consumers who dispute their First Tech account claiming that the account was the product of identity theft actually have their dispute reinvestigated by First Tech in any way.

Because Plaintiff's initial disputes did not include documents that met First Tech's top-secret, rigid, self-imposed standards for identity "authentication," the fraud department declined to reinvestigate the substance of her disputes. Hernandez Depo., at 61:2-9. First Tech did nothing to verify that Plaintiff was, in fact, the person who had purchased the Mitsubishi at Mission or had

applied for the loan from First Tech. As one First Tech representative put it, First Tech concluded that "we did not have sufficient information to determine ID theft, which that would be the determination point of what we're reporting is accurate or not." Skaale Depo., at 167:13-14. In other words, First Tech was unable to verify whether what it was reporting about Plaintiff was "accurate or not." *Id*. Nevertheless, even though it knew it lacked sufficient information to make a determination about whether identity theft had occurred, First Tech repeatedly verified its reporting to the CRAs, effectively – and falsely – conveying that Plaintiff's allegations of identity theft were without merit. Skaale Depo., at 164:21-165:9.

If First Tech had conducted any reinvestigation, it could have looked at the Loan Documents – which have been in First Tech's files since the date they were created – to discover persuasive proof of the identity theft Plaintiff had alleged. Unfortunately, First Tech's policies and procedures prevented its employees from looking at its own records. First Tech's policies and procedures prevent its own fraud investigators from seeking out original loan documents or other information within First Tech's control. Skaale Depo., at 153:18-154:23; Hernandez Depo., at 52:5-16. If it had looked at its own records of Redus' loan, it would have discovered numerous indicia of identity theft. When examining documents during their identity theft investigations, First Tech's fraud investigators recognize certain common indicia or "red flags" for identity theft, which include: differences in appearance of signatures on documents (Skaale Depo., at 110:3-7); indications that an identification document has been altered (*Id.*, at 110:3-7); conflicts in the information provided by the consumer through the documents (*Id.*, at 111:7-23); and fictitious addresses – places where mail could not actually be delivered – or an invalid phone number (*Id.*, at 112:6-113:15). As First Tech later admitted, **all** of these red flags were present in the Loan Documents. *Id.*, at 177:10-14; Hernandez Depo., at 72:20-23. However, when First Tech received

ACDVs in relation to Plaintiff's disputes, First Tech did not review any of its own documents to reinvestigate.

Within Plaintiff's fifth dispute, she submitted supporting documents, including a copy of a police report alleging identity theft by Redus, which she had filed after her previous four disputes. Ex. 12, at 2-3; Ex. 6. However, First Tech refrained from any reinvestigation of this dispute – this time because its employees made an inexplicable error in applying First Tech's policies and procedures. According to those policies and procedures, if First Tech received an ACDV and declined to modify its reporting, it would not conduct any new reinvestigations in response to successive ACDVs unless the consumer provided information and/or documents that were not submitted the first time. Ivanovic Depo., at 30:12-21, 38:15-18. First Tech's initial review of this fifth dispute erroneously concluded that the dispute included no new information and no new documents. Ex. 15, Deposition of Rosalie Espinoza Moreno ("Moreno Depo."), at 113:22-114:6. Consequently, that dispute was never submitted to First Tech's fraud department and, once again, was not reinvestigated at all. Skaale Depo., at 173:5-13. After the fact, the First Tech employee who conducted this initial review admitted that her assessment of that dispute was erroneous. Moreno Depo., at 116:10-22.

Plaintiff submitted her sixth dispute in June 2022, and an ACDV was again forwarded to First Tech. Ex. 12, at 2. This ACDV **also** contained new documents and new information that had not previously been submitted with Plaintiff's earlier disputes. Moreno Depo., at 131:3-132:24. Plaintiff submitted additional details about the circumstances of the identity theft, including information showing that the residence address provided in the loan application was a fraudulent address, and also Plaintiff's FTC Identity Theft Report. Ex. 5; Moreno Depo., at 132:14-24.

First Tech sent the dispute to its fraud department on Thursday, June 17, 2022, asking for a reinvestigation and noting that the deadline to respond was the following Tuesday. Ex. 12, at 2. The employee handling the reinvestigation, Rosalia Moreno, informed the fraud department that, if it could not complete the reinvestigation by Tuesday, June 22, she would respond to the ACDVs by verifying the disputed information **before any reinvestigation was performed**. *Id.* On June 21, before the fraud department had completed its reinvestigation, First Tech responded to the CRAs, once again verifying the disputed information asserting that a reinvestigation had been completed even though there had been no reinvestigation. Moreno Depo., at 120:9-130:8. When asked about this sequence of events – meaning, a dispute response issued before any reinvestigation was ever actually performed – First Tech **admitted this conduct violated the FCRA**:

> Q: [Y]ou testified that a reinvestigation that only begins after the ACDV response is submitted does not comply with the FCRA, correct?
>
> A: Correct.
>
> Q: Do you agree that these circumstances with a reinvestigation beginning on June 23rd in response to an ACDV response sent to Equifax on June 21st is exactly the scenario that I'm discussing of a reinvestigation beginning after the ACDV response is submitted?
>
> A: Yes.
>
> Q: So if you agree it is precisely the same circumstance that we're evaluating, then logically you must agree that this failed to comply with the FCRA by responding -- or, excuse me, by reinvestigating two days after the response, correct?
>
> A: Yes.

Ivanovic Depo., at 163:8-164:1.

Despite First Tech's premature disposition of the third set of ACDVs, its fraud department did finally conduct a reinvestigation, albeit a limited one. This reinvestigation was still

unreasonable, because First Tech, following its procedures, refused to review information contained in its own files about Plaintiff's loan, and that its own policies and procedures recognized as red flags for identity theft. For example, First Tech's fraud investigator did not consider it a red flag that the identification card presented with the loan application was in the name of "Ann Parsell," the loan was taken out in the name "Ann Parsell," but the loan was signed "Carol L Redus." *Id.*, at 86:15-87:20, 169:1-7. The fraud investigator assumed that Mission had made an adequate verification of the applicant's identity, but they did not contact the dealership to confirm this assumption. *Id.*, at 181:13-25. Having missed these red flags identified in its own policies, the fraud investigator did not contact the police department where Plaintiff had filed her official report of identity theft. *Id.*, at 83:7-13. As a result of its cursory reinvestigation, the fraud department concluded yet again that the information on the loans applications was accurate and that the claim should be denied. Ex. 12, at 1-2.

As noted above, First Tech never investigated the substance of Plaintiff's allegations of identity theft before it responded to any of the disputes that came via the CRAs. The plain text of § 1681s-2(b)(1) establishes that a furnisher's reinvestigation of a consumer dispute must involve a review of "all relevant information provided by the consumer reporting agency pursuant to section 1681i(a)(2) of this title." 15 U.S.C. § 1681s-2(b)(1)(B). In addition, because the furnisher must "report **the results** of the investigation" to the CRA, such investigation must be completed **before** a furnisher responds to the CRA. See 15 U.S.C. § 1681s-2(b)(1)(C) (emphasis added). Through testimony and its own internal records, First Tech admitted that it never reviewed all of the information provided by the CRAs before it responded to any of Plaintiff's disputes.

First Tech cannot claim that it conducted a legally sufficient reinvestigation by making a preliminary inquiry about whether Plaintiff's dispute included sufficient authentication of her

identity. First, and most importantly, nothing in the FCRA makes authentication of the disputant's identity a condition for a furnisher's duty to reinvestigate. Given that First Tech's requirement for identity authentication was self-imposed and not mandated by statute, it was further unreasonable for First Tech to fail to follow up with Plaintiff to make an affirmative request for authentication.

In any event, § 1681s-2(b) requires First Tech to do more than conduct a preliminary inquiry into the identity of person disputing and to verify the account balance and payment history without any inquiry into the substance of the dispute. As the Fourth Circuit has noted:

> the plain meaning of "investigation" clearly requires some degree of careful inquiry by creditors. Further, § 1681s-2(b)(1)(A) uses the term "investigation" in the context of articulating a creditor's duties in the consumer dispute process outlined by the FCRA. It would make little sense to conclude that, in creating a system intended to give consumers a means to dispute - and, ultimately, correct - inaccurate information on their credit reports, Congress used the term "investigation" to include superficial, unreasonable inquiries by creditors.

*Johnson v. MBNA Am. Bank, NA*, 357 F.3d 426, 430-31 (4th Cir. 2004) (citing *Pinner v. Schmidt*, 805 F.2d 1258, 1262 (5th Cir. 1986)); *see also Boggio v. USAA Fed. Sav. Bank*, 696 F.3d 611, 616, 620 (6th Cir. 2012) (holding that a furnisher's cursory confirmation of account status is insufficient).

In addition to the unreasonableness of First Tech's policy regarding proof of identity, it was also unreasonable for First Tech to refuse to review the Loan Documents which were already in its possession, even if Plaintiff did not supply them with one or more of her disputes. Section 1681s-2(b) expressly provides that a furnisher's duty of reinvestigation is coextensive with a CRA's duty of reinvestigation under § 1681i. See 15 U.S.C. § 1681s-2(b)(1)(B). Applying the standards of § 1681i, other courts have held that overlooking relevant and available documents constitutes an unreasonable reinvestigation as a matter of law under 1681i. *See Dennis v. BEH-1, Ltd. Liab. Co.*, 520 F.3d 1066, 1071 (9th Cir. 2008) (granting summary judgment to the plaintiff because a CRA

conducted a reinvestigation without examining relevant and available documents).

Furthermore, First Tech's reinvestigations were unreasonable because they failed to follow its own policies and procedures. Regulations promulgated pursuant to the FCRA require furnishers to have policies and procedures to assure the accuracy of the information that they provide to CRAs. *See* 12 C.F.R. § 1022.42(a) ("Each furnisher must establish and implement reasonable written policies and procedures regarding the accuracy and integrity of the information relating to consumers that it furnishes to a consumer reporting agency."). First Tech's employees admitted that, in responding to disputes from Plaintiff, First Tech failed to implement its own policies and procedures as § 1022.42(a) requires. Specifically, it failed to conduct a reinvestigation after Plaintiff had submitted new information and documents with her second set of disputes, and it responded to the third set of disputes in June 2022 before its fraud department had actually conducted its reinvestigation, or any reinvestigation was conducted whatsoever. Moreno Depo., at 113:22, 120:9-130:8; Skaale Depo., at 173:5-13; Ivanovic Depo., at 163:8-164:1.

### B. First Tech's Admissions and Undisputed Facts Demonstrate First Tech Acted in Reckless Disregard of the Requirements of § 1681s-2(b) When Its Procedures Precluded an Investigation That Complied with the Requirements of 1681s-2(b) and When It Failed to Even Follow Those Policies.

The FCRA authorizes consumers to bring private suits for willful violations of its terms. 15 U.S.C. § 1681n(a)(2). In the context of the FCRA, "willful" includes knowing, intentional, and reckless violations of the statutory requirements. *Safeco Ins. Co of America v. Burr*, 551 U.S. 47, 59-60, 70 (2007). A furnisher's violation of the FCRA is willful when the furnisher "fail[s] to follow its own FCRA reinvestigation procedures." *Price v. Sallie Mae, Inc.*, No. 1:08-CV-2712-CAP-ECS, 2010 U.S. Dist. LEXIS 155881, at *14-15 (N.D. Ga. Aug. 23, 2010) (internal quotation marks and citation omitted). A furnisher is also liable for a willful violation when it makes a conscious decision not to reinvestigate a consumer dispute. *Akalwadi v. Risk Management*

*Alternatives, Inc*., 336 F. Supp. 2d 492, 511 (D. Md. 2004) ("To prevail on a willful noncompliance claim and recover punitive damages, [the plaintiff] must show that [the defendant] knowingly and intentionally did not investigate the disputed debt in conscious disregard for his rights."). Similarly, when a furnisher engages in repeated violations of its duties under the FCRA, those violations are willful. *James v. MRC Receivables Corp*., No. 16-0448, 2018 U.S. Dist. LEXIS 109493, at *17 (W.D. La. June 28, 2018) (holding that facts showing a repeated, knowing violation of FCRA requirements "would be sufficient to support a finding that Midland willfully intended to harm James."); *see also Haberman v. PNC Mortg. Co.,* No. 4:11cv126, 2012 U.S. Dist. LEXIS 191086, *24-25 (E.D. Tex. Sep. 7, 2012) ("The Court finds by a preponderance of the evidence that either these ongoing intrusions were intentional, or **Defendant cared so little about the duties owed under the FCRA that such conduct was done with reckless disregard of Haberman's rights, giving rise to a willful violation of the statute**.") (emphasis added).

The undisputed facts show that First Tech's violations of its duties were willful because they involved conscious decisions not to reinvestigate Plaintiff's dispute and other repeated violations of its own policies and procedures. In addressing Plaintiff's sixth dispute, First Tech deliberately chose to respond to the ACDVs and verify its reporting to the CRAs before it had completed its investigation, knowingly violating both the FCRA and its own procedures. Moreno Depo., at 120:9-130:8; Ivanovic Depo., at 163:8-164:1. When Plaintiff submitted her fifth dispute, which came to First Tech via an ACDV with new information and new documents, First Tech again decided not to conduct a reinvestigation, even though its policies and procedures specifically called for one under those circumstances. Moreno Depo., at 113:22-114:6. All of these violations – which First Tech testified to at length – reflect a reckless disregard for First Tech's statutory duties and therefore entitle Plaintiff to statutory and punitive damages under 15 U.S.C. § 1681n.

## V. CONCLUSION

First Tech has admitted facts that lead to one conclusion and one conclusion only: First Tech violated its own policies and procedures and the FCRA when it responded to Plaintiff's disputes alleging identity theft. Such conduct is not a merely negligent violation of the requirements of 15 U.S.C. § 1681s-2(b), it is also willful. Consequently, Plaintiff asks this Court to grant her Partial Motion for Summary Judgment and hold that First Tech negligent and willfully violated the FCRA and allow a jury to evaluate the amount of damages to which she is entitled.

Dated: May 29, 2024,

*/s/ James Ristvedt*
James Ristvedt, AZ Bar No. 035938
David A. Chami, AZ Bar No. 027585
**CONSUMER ATTORNEYS**
8245 North 85th Way
Scottsdale, Arizona 85258
T: (480) 626-1956; (480) 626-2359
Email: jristvedt@consumerattorneys.com;
dchami@consumerattorneys.com

*Attorneys for Plaintiff Ann Marie Parsell*

## CERTIFICATE OF SERVICE

I hereby certify that on May 29, 2024, I electronically filed the foregoing with the Clerk of the Court using the ECF system, which will send notice of such filing to all attorneys of record in this matter. Since none of the attorneys of record are non-ECF participants, hard copies of the foregoing have not been provided via personal delivery or by postal mail.

**CONSUMER ATTORNEYS**

By: */s/ Irina Iakovleva*
Irina Iakovleva